UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/09/2022
```

------------------------------------------------------------------ X

CYBER APPS WORLD, INC.,
                    :
                    :
            Plaintiff,     :        21-CV-10302 (VEC)
                    :
      -against-       :        OPINION & ORDER
                    :

EMA FINANCIAL, LLC,
                    :
                    :
            Defendant.   :

------------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

Plaintiff Cyber Apps World, Inc. ("Cyber Apps") sued Defendant EMA Financial, LLC ("EMA") regarding a dispute that arose out of a convertible note that Cyber Apps sold to EMA. Am. Compl., Dkt. 26.  EMA moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Mot., Dkt. 33.  For the following reasons, Defendant's motion to dismiss the Amended Complaint is GRANTED except as to Plaintiff's claim for breach of contract regarding one provision of the contract and for market manipulation.[1]

## BACKGROUND[2]

EMA is a private investment firm that extends "death spiral" financing to struggling companies, Am. Compl. ¶¶ 2; *see also id.* ¶ 16; EMA's contracts allow it to convert its debt to shares in the debtor company, often at rates below the market price of the debtor company's

---

[1]     Plaintiff initially sought a constructive trust, Am. Compl., Dkt. 26 ¶¶ 166–71, but it has since retracted that claim.  Pl. Opp., Dkt. 40 at 26 n.11.  Accordingly, the motion to dismiss as to Plaintiff's constructive trust claim is denied as moot.

[2]     The well-pled facts in the Amended Complaint are assumed true for purposes of evaluating Defendant's motion to dismiss.  *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

shares.[3]  On September 14, 2020, the parties entered into a Securities Purchase Agreement

("SPA"), pursuant to which Cyber Apps agreed to sell EMA a convertible note in the company

with a principal value of $60,000 and an "original issue discount of $3,000." *Id*. ¶¶ 40–41.  The

Note carried a 12% interest rate.  *Id.* ¶ 40.  After a variety of fees were deducted, $52,500 in

proceeds were disbursed to Plaintiff.  *Id.* ¶ 41–42.

> The Note allows EMA to convert its debt (which includes principal and interest due, *id.* ¶

46) to shares at

> > the lower of (i) the lowest closing price of the Common Stock
> > during the preceding twenty (20) Trading Day period ending on the
> > latest complete Trading Day prior to the Issue Date of this Note or
> > (ii) 60% of the lowest trading price for the common Stock on the
> > Principal market during the twenty (20) consecutive Trading days
> > including and immediately preceding the conversion Date.

*Id*.  ¶¶ 50.

> Section 4(m) of the SPA also contains a "most favored nation" ("MFN") clause; that

clause provides that if Defendant reasonably believes that Plaintiff has sold or issued stock under

terms more favorable to that investor than the terms of the SPA and Note, the SPA and the Note

will be automatically amended to give the Defendant the benefit of those more favorable terms.

*Id*. ¶¶ 61–62.  In addition, the SPA and Note both contain forum selection clauses that select

Nevada law.  Am. Compl. Ex. 1, Dkt. 26 § 10(a); Am. Compl. Ex. 2, Dkt. 26 § 4.6.

> On March 10, 2021, Plaintiff notified EMA that it intended exercise the prepayment

option available under the Note.  Am. Compl. ¶ 58.  In response, Defendant informed Plaintiff

that it was invoking section 4(m) of the SPA because it believed that Plaintiff had entered into a

---

[3]       In this type of financing, "a lender provides an early-stage company with capital in exchange for debt that
can be converted to stock in the company.  The economics can cause the price of the company issuing the stock to
plunge to nearly zero when the lender exercises multiple rounds of conversion and sale of the stock on the open
market at successively lower prices." *Parallax Health Scis., Inc. v. EMA Fin., LLC*, No. 20-CV-2375, 2022 WL
2442338, at *7 n.10 (S.D.N.Y. June 13, 2022) (citation omitted).

more favorable agreement with another entity. *Id.* ¶ 59. Therefore, according to EMA, the Note was amended to reflect a principal amount due of $64,000 and a prepayment premium of 145%. *Id.*

On April 6, 2021, EMA instructed Plaintiff's transfer agent to convert to shares $65,000 in principal and $4,210.83 in interest due to it. *Id.* ¶ 70. EMA withdrew its conversion request two days later, and the transfer agent did not process the conversion.[4] *Id.* ¶¶ 72, 74. Between May 4, 2021 and May 18, 2021, Defendant submitted five conversion notices to Plaintiff and the transfer agent. *Id.* ¶ 77. In total, EMA converted $93,925.78 in debt to 18,369,800 Cyber Apps shares. *Id.* ¶ 79. Defendant sold the shares immediately after conversion, "purposefully driving down Cyber Apps' share price," *id.* ¶ 82; EMA eventually earned $241,758.40 by selling the Cyber Apps shares it received in exchange for the $52,500 it lent to Cyber Apps, *id.* ¶ 81.

Cyber Apps now sues EMA for recission pursuant to sections 15(a) and 29(b) of the Securities Exchange Act of 1934, breach of contract, and market manipulation in violation of section 10(b) and rule 10b-5 of the Securities Exchange Act; Plaintiff also alleges that Defendant has been unjustly enriched. *Id.* ¶¶ 109, 123, 125, 130–33, 139, 165.

## DISCUSSION

### I.    Legal Standard

"To survive a motion to dismiss under [Rule] 12(b)(6), a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, (2007)). "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin*

---

[4]     Plaintiff alleges that Defendant withdrew the conversion notice so that Defendant could benefit from a more favorable conversion price; Plaintiff's share price had been declining at the time. Am. Compl. ¶ 75.

*Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  The Court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  Moreover, courts are not "bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  When considering a Rule 12(b)(6) motion to dismiss, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

## II.    The Recission Claims Are Dismissed

Section 15 of the Securities Exchange Act requires all brokers or dealers who do not operate exclusively on an intrastate basis to register with the Securities and Exchange Commission.  *See* 15 U.S.C. § 78o(a)(1).  Plaintiff argues that, because EMA failed to register as a broker-dealer as allegedly required by section 15 of the Securities Exchange Act, the SPA and the Convertible Note are invalid pursuant to section 15(a).  *See* Am. Compl. ¶¶ 109, 112.  While section 15(a) imposes a duty on those acting as brokers and dealers to register, it does not establish a private right of action.  *See EMA Fin., LLC v. Vystar Corp., Inc.*, No. 19-CV-1545, 2021 WL 1177801, at *3 (S.D.N.Y. Mar. 29, 2021).  Accordingly, there is no cause of action to support Plaintiff's claim brought pursuant to section 15(a), and Defendant's motion to dismiss is granted as to that claim.

Section 29(b) provides that "[e]very contract made in violation of any provisions of this chapter . . . the performance of which involves the violation of . . . any provision of this chapter or any rule or regulation thereunder, shall be void . . . ."  15 U.S.C. § 78cc(b).  "[U]nder § 29(b) of the Exchange Act, only unlawful *contracts* may be rescinded, not unlawful *transactions* made

pursuant to lawful contracts." *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) (quoting *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981)).  This applies both to claims regarding the making of a contract as well as contract performance.  *See EMA Fin., LLC*, 2021 WL 1177801, at *3 (holding that contracts that "were neither made nor performed in violation of any federal securities laws" were not voidable under Section 29(b)).  Thus, recission pursuant to section 29(b) would only be available here if the contract itself required EMA to register as a broker-dealer.  *See Yi v. GTV Media Grp. Inc.*, No. 21-CV-2669, 2021 WL 2535528, *5 (S.D.N.Y. June 18, 2021).

Because the contract does not require Defendant to register as a broker-dealer, recission is not an available remedy.  "Plaintiff acknowledges that case law supports Defendant's position," Pl. Opp., Dkt. 40 at 14, but nonetheless requests the Court to go against the weight of caselaw.  The Court declines to do so.

Defendant's motion to dismiss Plaintiff's claim for recission is granted.

## III.    The Unjust Enrichment Claim Is Dismissed

Plaintiff claims that Defendant has been unjustly enriched because the contract violates section 40 of the New York Penal Code by charging an interest rate greater than 25%.  Am. Compl. ¶¶ 159–62.  Plaintiff's New York state law claim fails, however, because the parties agreed that the contract would be governed by Nevada law.  *See* Am. Compl. Ex. 1 § 10(a).

New York courts will generally "enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or to the transaction."  *Madden v. Midland Funding*, *LLC*, 237 F. Supp. 3d 130, 148 (S.D.N.Y. 2017) (quoting *Welsbach Elec. Corp v. MasTec N. Am., Inc.*, 825 N.Y.S.2d 692, 694 (N.Y. 2006)).  The chosen state has a reasonable relationship to the dispute if one of the contracting party's principal places of business is in the

selected state.  *See id.*  The Court finds that Nevada bears a "reasonable relationship" to this dispute because Plaintiff is incorporated in Nevada and has its principal place of business there. Am. Compl. ¶ 11.

Plaintiff argues that the party's choice of law is unenforceable because New York's prohibition on usury is an important public policy.  Pl. Opp. at 19–20.  Plaintiffs are correct that "New York's usury prohibition constitutes a fundamental public policy," *Madden*, 237 F. Supp. 3d at 150 (citation omitted), but the policy interests underlying New York's usury prohibition do not extend to Plaintiff.  Corporations are  "the antithesis of the type of needy and unsophisticated consumers" that New York usury laws were designed to protect.  *United States v. Moseley*, 980 F.3d 9, 22 (2d Cir. 2020) (New York's usury prohibitions do not preclude the application of choice-of-law provisions selecting the laws of states without usury laws where the debtor is a corporation).

## IV.   **Plaintiff Adequately States a Claim of Market Manipulation**

Plaintiff alleges that the Defendant violated section 10(b) and rule 10b-5 of the Securities Exchange Act by manipulating the price of Cyber Apps stock through a "death spiral" scheme. Am. Compl. ¶¶ 139–57.  Plaintiff claims that the Defendant "dump[ed]" Cyber App stock into the market to depress the share price to increase the number of shares that it was able to obtain when it converted debt to equity pursuant to the terms of the Note.  *Id.* ¶ 3.

The pleading requirements for a market manipulation claim pursuant to section 10(b) and rule 10b-5 are as follows: plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  *See ATSI Commc'ns, Inc. v. Shaar Fund*,

*Ltd.*, 493 F.3d 87, 1001 (2d Cir. 2007) (citations omitted).  The Private Securities Litigation

Reform Act's heightened standards for pleading scienter also apply.  *See id.* at 102.

"To be actionable as a manipulative act, short selling must be willfully combined with

something more to create a false impression of how market participants value a security."  *Id.* at

101.  Plaintiff can "plausibly plead[] 'something more'" if it alleges that EMA not only sold

large volumes of its stock, but also that EMA shorted the shares in advance of conversion not

because it genuinely believed that the shares were overpriced but in order to "drive down

[Plaintiff's] price and increase the number of shares [Defendant] could obtain."  *Tanzanian*

*Royalty Expl. Corp. v. Crede CG III, Ltd.*, No. 18-CV-4201, 2019 WL 1368570, at *9–10

(S.D.N.Y. Mar. 26, 2019) (quoting *ATSI Commc'ns Inc.*, 493 F.3d at 101).

It is reasonable to infer from the allegations in CyberApps' complaint that EMA willfully

engaged in manipulative conduct.  *See Gibbons*, 703 F.3d at 599.  Plaintiff has plausibly, albeit

barely, pled that EMA was short selling as part of a manipulative scheme to depress Plaintiff's

prices.  Plaintiff alleges that "EMA was . . . short-selling Cyber Apps' stock, and using shares

obtained via the conversions to cover its short position."  Am. Compl. ¶ 84.  Plaintiff has also

alleged that EMA engaged in "something more" by alleging that "EMA sold stock not for any

reason other than to depress the value of it and thereafter utilize such depressed stock prices to

better gain from the conversions."  *Id.* ¶ 147.  Plaintiff's allegations bear close resemblance to

the cross-claimant's allegations in *EMA Financial, LLC*, which claimed that EMA engaged in

"an overall scheme to time conversions and sales to lower [the] common stock price to EMA's

advantage" over a short period of time, enabling EMA to obtain "millions of . . . shares;" those

allegations were deemed sufficient to state a claim.  *EMA Fin. LLC*, 2021 WL 117801, at *5

(internal quotation omitted).  Plaintiff alleges that EMA acted to "drive down" Cyber Apps'

stock price in order to enable it to obtain more Cyber Apps shares to EMA's financial benefit. *See Tanzanian Royalty Expl. Corp.*, 2019 WL 1368570, at *10.

While it remains to be seen whether Plaintiff can prove its market manipulation claim, it has barely marshalled sufficient facts to get into discovery.  Defendant's motion to dismiss Plaintiff's market manipulation claim is denied.

## V.     The Contract Claims Are Dismissed in Part

Plaintiff alleges three separate breach of contract claims, two involving the implied covenant of good faith and fair dealing and one for breach of contract.  Plaintiff brings the breach of the implied covenant of good faith and fair dealing and breach of contract claims as alternative theories of liability.[5]

### A.  Breach of Contract Claim

Plaintiff claims that Defendant breached section 2(a) of the SPA, which provides that the Defendant was acquiring the Note and the Conversion Shares without a view towards resale. Am. Compl. ¶ 132; *see also* Am. Compl. Ex. 1 §2(a).  Defendant argues that breach of that provision is not possible because the SPA expressly states that there are no restrictions on EMA's right to sell Cyber Apps stock.  *See* Def. Mem., Dkt. 35 at 20; Am. Compl. Ex. 1 § 2(a) ("Purchaser does not agree, or make any representation or warranty, to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time. . . .").

---

[5]     Defendant attempts to rely on *Houston v. Geico Casualty Co.*, No. 20-CV-1505, 2021 WL 682060 (D. Nev. Feb. 22, 2021), for the proposition that Plaintiff improperly pled the contract claims as one claim instead of separating them into three claims.  Def. Mem., Dkt. 35 at 18.  In *Houston*, however, the complaint alleged facts from which it could be inferred that the defendant had breached the contract (supporting a claim for breach of contract) but had not alleged any facts that would support an inference that the defendant complied with the literal terms of the contract but had violated its spirit (i.e., the predicate for a breach of the implied covenant of good faith and fair dealing claim).  *Houston*, 2021 WL 682060 at *3.  Here, Plaintiff has alleged facts specific to both types of claims. Am. Compl. ¶¶ 128–33.

Even if EMA's initial purpose was solely to invest in the Plaintiff company, there is nothing in the contract that prevents EMA from changing its strategy. The contract gives EMA the flexibility to sell any Cyber Apps shares it acquires with no contractual restrictions. *See id.* Courts in this district have held that such an explicit contractual grant of the right to sell negates the possibility of a misrepresentation claim, even when the investor has made statements regarding beneficent intentions towards the borrower, *see Parallax Health Scis., Inc.*, 2022 WL 1446521 at *10, or included "investment purpose" clauses in the contract, *see Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 443–44 (S.D.N.Y. 2001).

Plaintiff argues that the SPA's express disclaimer does not defeat its claim because whether Plaintiff reasonably relied on Defendant's stated "investment purpose" as described in section 2(a) is a question of fact that cannot be resolved on a motion to dismiss. Pl. Opp. at 24. Whether Plaintiff reasonably relied on Defendant's expressed investment purpose is, however, irrelevant; the contract expressly allowed EMA to sell any shares it obtained through conversion at any time. *See Log On Am., Inc*, 223 F. Supp. 2d at 443, 443 n.14.

Because Plaintiff cannot allege that Defendant breached the contract by doing what it was contractually permitted to do, Defendant's motion to dismiss that aspect of Plaintiff's breach of contract claim is granted.

### B.  Breach of Implied Covenant of Good Faith and Fair Dealing Claims

#### 1.  The Wrongful Scheme Claim Is Dismissed

Plaintiff claims that the Defendant breached the implied duty of good faith and fair dealing by engaging in a wrongful scheme to drive down Plaintiff's stock price to Defendant's gain, activity in which the contract implies Defendant will not engage. Am. Compl. ¶ 130. Defendant argues that because the contract allows EMA to convert the Notes and sell the shares

at any time, the consequences of doing so cannot breach any implied duty.  Def. Mem. at 20; Def. Reply, Dkt. 41 at 15.

      The alleged facts do not support a claim for a breach of the implied duty of good faith and fair dealing.  The contract explicitly reserves EMA's right to sell the shares it obtained at any time, and "an obligation cannot be implied which is inconsistent with or negates the express terms of the contract."  *Goureau v. Lemonis*, 20-CV-4691, 2021 WL 4847073 (S.D.N.Y. Oct. 15, 2021) (quoting *In Touch Concepts v. Cellco P'ship*, 949 F. Supp. 2d 447, 470 (S.D.N.Y. 2013)). While the Court understands the distress of borrowers who end up on the wrong side of EMA's death spiral financing, there is nothing inherently improper about death spiral financing. *Parallax Health Scis.*, *Inc*., 2022 WL 1446521 at *11 (discussing a contract between EMA and Parallax with similar provisions to the contract between EMA and Cyber Apps).  EMA takes substantial risk lending to small, (apparently) desperate companies.  Sometimes it makes substantial profit (as here); sometimes it loses its investment and ends up with a likely-uncollectible judgment.  *See*, *e.g.*, *EMA Fin. v. WOD Retail Sols., Inc*., 20-CV-3519, Order, Dkt. 28 (awarding EMA a default judgment for $330,000).

### 2.  The Motion to Dismiss Is Denied as to Plaintiff's Section 4(m) Claim

      Plaintiff alleges that Defendant acted in bad faith by "advanc[ing] a knowingly meritless interpretation" of the contract's MFN clause to interfere with Plaintiff's attempt to prepay the debt.  Am. Compl. ¶ 131.  Plaintiff alleges that the MFN clause was not implicated because the investor with the purportedly "more favorable" note provided Cyber Apps with more capital than EMA had, Am. Compl. ¶¶ 65–66.  Because EMA knew of that difference, it appears to be Plaintiff's position that it could not have had a "reasonable belief" that the MFN clause was triggered.  Pl. Opp. at 23.  In support of its motion to dismiss, Defendant argues that section 4(m) does not require the purportedly "more favorable" note to be identical to EMA's, just that the

Defendant have a "reasonable belief" that more favorable terms were given to the other party. Defendant claims that it had just such a reasonable belief. Def. Mem. at 19-20.

Although not artfully pled, the Amended Complaint adequately alleges (albeit barely) that Defendant did not, in fact, have a reasonable belief that another lender had been given more favorable terms. The Court must accept that allegation as true when deciding the motion to dismiss. Whether Plaintiff can prove it remains to be seen, but because courts cannot resolve factual disputes when deciding a 12(b)(6) motion, *see United States ex rel. Daughtery v. Tiversa Holding Corp.*, 342 F. Supp. 3d 418, 425 n.1 (S.D.N.Y. 2018) (citing *Nocsia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016)), Defendant's motion to dismiss this claim is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED as to the recission claim, unjust enrichment claim, as well as Plaintiff's breach of contract claims for engaging in a wrongful scheme and violating section 2(a) of the parties' contract. The motion to dismiss is DENIED as to the market manipulation and breach of contract claim based on section 4(m). The Clerk of Court is respectfully directed to terminate the open motion at docket entry 33.

The initial pretrial conference is rescheduled for **Friday, January 13, 2023, at 10:00 A.M.** in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, 10007. By no later than **Thursday, January 5, 2023**, the parties must submit their proposed case management plan and a joint letter, the content of which is described in the Court's order at docket entry 12, and also indicate whether the parties request a referral to the

Court-annexed mediation program or to their assigned magistrate judge for a settlement

conference.

**SO ORDERED.**

**Date:   December 9, 2022**
**New York, NY**

                          **VALERIE CAPRONI**
                     **United States District Judge**